FUGINA and another, Appellants, vs. CHICAGO & NORTH-WESTERN RAILWAY COMPANY, Respondent.

*January 14—March 15, 1910.*

*Navigable waters: Opening of drawbridges: Negligence: Rules of War Department: Publication: Evidence: Custom.*

1. The rules and regulations concerning the opening of drawbridges, authorized to be made by the secretary of war under the River and Harbor Act of August 18, 1894, and required to be published in order to have the force of law, cannot be held, as a matter of law, to have been published, upon evidence of mere delivery to a government officer of a limited number of copies with instructions to deliver them to the commanding officers of vessels touching at a certain port, when it affirmatively appears that neither the captain of the vessel in question nor other captains plying those waters had any notice of such rules.

2. In the absence of publication of rules and regulations of the War
   Department bearing upon the subject, it is competent to prove
   a custom, existing for seven years, to the effect that an ap-
   proaching boat blew its whistle only when a drawbridge was
   closed, as a signal to open it, but not when the bridge was
   already open.

   MARSHALL, J., dissents.

APPEAL from a judgment of the circuit court for Buffalo
county: E. W. HELMS, Circuit Judge. *Reversed.*

This action was brought to recover damages for injuries
to appellants' steamboat caused by the swinging against it of
the draw span in respondent's bridge across the Mississippi
river at Winona, Minnesota. It is alleged in the complaint
that while the boat was passing through the open draw re-
spondent negligently swung the draw span against the boat.
The answer admits ownership and operation of the bridge by
respondent, denies negligence, and alleges that the injury
was caused by the negligence of the appellants. After the
evidence was in, the court directed a verdict in favor of the
respondent. After denial of a motion for a new trial, judg-
ment was entered in favor of the respondent, from which
this appeal was taken.

For the appellants there was a brief by *M. L. Fugina* and
*Webber & Lees,* and oral argument by *Mr. E. L. Lees* and
*Mr. Fugina.*

*William G. Wheeler,* for the respondent.

The following opinion was filed March 15, 1910:

KERWIN, J. The errors assigned may be classified under
three heads: (1) in directing a verdict for defendant; (2) in
excluding evidence offered by appellants; and (3) in refus-
ing a new trial.

The evidence tends to prove that on September 8, 1908,
the appellants' steamboat E. Rutledge, under the command
of Wm. H. Wier, a duly licensed master and pilot on the
Mississippi river, reached Winona at 2 p. m. and landed at

the public levee on the south bank of the river.    The river at
this point runs east and is spanned west of the levee by two
bridges, one a high wagon bridge, the other the respondent's
railway bridge, which is a drawbridge, the draw being lo-
cated on the south or Minnesota side of the river.    There are
two channels through the draw, one on either side of the
pivot pier on which the draw span revolves.    On the north
side of the south channel there is a pier 360 feet long which
is built of piling driven into the river, forming a long box
filled with stone and extending longitudinally up and down
the river, in the center of which is the pivot pier upon which
the draw span swings.    The channel on each side of the pier
is about 150 feet wide.    When the Rutledge landed at the
levee a steamboat called the La Crosse was lying about 300
feet below.    The Rutledge started up river to Fountain City,
but shortly before leaving the levee the La Crosse blew her
whistle as a signal to open the draw, which was then closed,
but which immediately opened to its full width, and was so
open when the Rutledge and La Crosse proceeded up stream.
The La Crosse pulled out first and was immediately followed
by the Rutledge, the two boats being about 200 feet apart as
they went into the draw with the La Crosse in the lead, both
boats taking the south channel through the draw.    Before
the La Crosse had cleared the draw the master of the Rut-
ledge observed the draw span swinging off the pier toward
his boat.    At this time his boat was about seventy-five feet
below the pier and running at about nine miles an hour.
Immediately upon observing the movement of the draw span
signals were given to stop the boat and reverse the motion of
her wheel, thereby reducing the speed to about three miles an
hour; but before she could be stopped the bridge struck her
on the right-hand side, knocking down the smokestacks and
pilot house and causing other injury.    When the draw first
began to swing the stern of the La Crosse was about opposite
the pivot pier, the La Crosse then being about half way

through the draw. No warning signal was given by blowing the whistle on the engine house on the draw. About thirty feet in length of the Rutledge had passed the bridge before the collision. The collision occurred about 3 p. m. of a perfectly clear, bright day. From the time the Rutledge left the levee until the collision the engine house on the draw span was in plain sight. No signal was given by the engineer on the draw when the draw span began to swing.

The defendant put in evidence sec. 5 of the River and Harbor Act of August 18, 1894 (ch. 299, 28 U. S. Stats. at Large, 362, U. S. Comp. Stats. 1901, p. 3538), which provides for the opening of drawbridges across navigable rivers of the United States and authorizes the secretary of war to make such rules as in his opinion public interests require, and further provides that when such rules and regulations are made and published they shall have the force of law. Also regulations 1 and 2, passed in pursuance thereof, as follows, were offered:

"1. Whenever a steamboat is to be passed through the channel at any drawbridge, the officer or person in charge thereof shall cause to be sounded, when said boat shall be at a distance not less than one half mile, but within signaling distance from said bridge, one long blast of a steam whistle.

"2. When a steamboat is to leave a landing one half mile or less from a drawbridge, with the intention to pass through the bridge draw, the officer or person in charge of said steamboat shall cause to be sounded the required signal, a sufficient time before leaving the landing to allow the bridge to be opened in time."

These rules were made by the secretary of war May 31, 1901. No proof was made of the publication of these rules or regulations except that some twenty copies were sent to the United States engineer in charge of improvements on the Mississippi river from Winona to the mouth of the Wisconsin river with instructions to give them to the commanding officers of every vessel that touched at La Crosse, and that

he distributed these copies to different boats, but that he had
no recollection of delivering a copy to Capt. Wier of the
Rutledge or posting a copy on the Rutledge, and that the
Rutledge entered the upper waters of the Mississippi before
1901.   Captains De Mars, Wier, Cassidy, and *Fugina,* all
running boats on the upper Mississippi since 1901, testified
that they never saw nor received the rules or regulations re-
ferred to.   It also appears from the evidence that the fol-
lowing pilot rules governing pilots on the Mississippi river
were in force at the time of the accident, viz.:

"Rule 12. In obeying and construing these rules due re-
gard shall be had to all dangers of navigation and collision,
and to any special circumstances which may render a depart-
ure from the above rules necessary in order to avoid imme-
diate danger."

Also the amended pilot rule, adopted January, 1907: "Un-
necessary sounding of the steam whistle is prohibited within
any harbor limits of the United States."   The foregoing
rules were offered in evidence by appellants and excluded.
The appellants also offered to prove that no copy of the rules
or regulations was posted on the Rutledge or on any other
steamboat upon which the witness had been since May 31,
1901, which evidence was excluded.   The court below seems
to have rested its opinion in direction of a verdict upon the
idea that the respondent had the right to rely upon the regu-
lations respecting the opening of drawbridges, hence in the
absence of a signal by the Rutledge was under no duty of ob-
servation as to whether the Rutledge was approaching, and
that the appellants had no right to run their boat up river
assuming that the draw would be left open.   This proposi-
tion, of course, is based upon the assumption that the rules
were regularly published, because, until they were, they had
no force under the act of Congress heretofore referred to,
which provides that "such rules and regulations, when so
made and published, shall have the force of law."   So we at

·once approach the question of whether the evidence was sufficient to establish as a matter of law the publication of the rules and regulations upon which the respondent relies. The act clearly contemplates a publication, and no attempt to prove publication was made, except as before stated, and there is evidence that neither the appellants nor the captain in charge ever received a copy or had any notice of the rules. There is also evidence that other captains on the river never :saw or received the rules.

Counsel for appellants calls our attention to sec. 4405, R. S. of U. S. (U. S. Comp. Stats. 1901, p. 3017) and the following rule made in pursuance thereof:

"Each master and pilot of steam vessels wherever employed shall when receiving his license, either original or renewal, be furnished with a pamphlet copy of the rules and regulations governing pilots, and of the statutes upon which such rules are made applicable upon the waters in which their licenses are intended to be used as stated in the body thereof."

Also to sec. 4412, R. S. of U. S. (U. S. Comp. Stats. 1901, p. 3020), providing that two copies of passing rules to be observed by vessels shall be furnished to each vessel and be kept posted in a conspicuous place thereon, and says that rules 1 and 2, hereinbefore referred to, are designed to govern the action of pilots on steam vessels as well as bridge tenders on drawbridges, and that in order that these rules be published to pilots and masters they should be furnished to them in the same manner as other government rules which describe their duties in navigating public waters. Our attention has also been called to the United States statutes which limit captains' licenses to five years, and provide for renewal, and it is argued that this, in connection with the rule that a copy of rules shall be furnished at time of issue of license or renewal, and the fact that the captain of the Rutledge was on this river from 1901, show he must have had either original

or renewal license, and should have known of rules and have received them if in existence or published. We have been cited to no authority, and are aware of none, which makes the mere delivery to the government officer in charge, as was done in this case, of a limited number of copies of the rules with instructions to deliver them to the commanding officers of vessels touching at La Crosse, a publication within the meaning of the act of Congress, which requires rules to be made and published. So we are therefore of the opinion that on such proof as the record here presents it cannot be said as matter of law that there was a publication of the rules, when it affirmatively appears that neither the captain of the Rutledge nor other captains plying the river had any notice of such rules; but we make this ruling without prejudice to the respondent's right to litigate and have determined upon another trial the question as to whether there was a publication of the rules.

The appellants further offered to prove that there was a custom existing upon the river for a period of seven years before the accident to the effect that, when a bridge was open, the approaching boat did not blow its whistle, and only blew it when the bridge was closed as a signal to open it. The contention on the part of the appellants is that it was competent to show this custom, especially since the rules had not been published and were not known or acted upon, and further, that the rules are ambiguous, and that the ambiguity is as to whether or not the whistle should be blown only when the bridge is closed. Rule 2 heretofore recited is the one bearing upon the case in hand and requires the signal to be sounded "a sufficient time before leaving the landing to allow the bridge to be opened in time," and pilot rule No. 12 heretofore quoted and the amendment thereto adopted in January, 1901. But from the view we take of the case it is unnecessary to decide, and we do not decide, whether the rules are ambiguous, but rest the disposition of the case upon

the competency of the evidence of custom in view of the fact that sufficient evidence was not offered to establish as matter of law publication of the rules.    Whether such evidence of custom would be admissible in case publication were established we need not and do not determine.    It is clear, in the absence of publication of the rules so as to be binding upon the appellants, that the question of defendant's negligence as well as the plaintiffs' contributory negligence were questions for the jury, and the court, therefore, was in error in directing a verdict.    It follows that a new trial should have been granted.

*By the Court.*—The judgment of the court below is reversed, and the cause remanded for a new trial.

The following opinion was filed April 8, 1910:

MARSHALL, J. (*dissenting*).    I understand the court decides there was not sufficient proof of publication of the rule alleged to have been violated, to render it valid as a matter of law, and, on that account, the cause was improperly taken from the jury.    That is, if at the time of the accident the rule was in force requiring the bridge tender to be signaled by the person in charge of any boat desiring to pass through the draw, when the boat is at least one half mile away, then actionable negligence was not established.

There is no question but what the rule was made and copies sent to the proper local officers for distribution, nor but what that occurred some eight years before the accident, nor but what the rule had been customarily, at least, observed. It was obeyed by the person in charge of the boat which preceded the Rutledge.    There is no question but what, if the rule had been published, it had the force of law just the same as if incorporated into an act of Congress, and was as binding on those who actually knew of it as those who did not.

I cannot understand the significance of the observations

in the opinion, that the captain of the Rutledge and some other captains did not know of the rule and that it was not posted up on the boat. It seems such observations, if intended to indicate that the rule, if published at all, was not law as regards those who did not have actual knowledge thereof, or that evidence that some did not have knowledge of the same, was proof, negative of publication, they are erroneous and, in any event, misleading. Truly, the effect of publication must be the same in this case as in any other where an enactment depends upon such a circumstance for validity. It would not be thought, for a moment, that one could raise a controversy as to whether an act of the legislature had been efficiently published by proving that many persons intended to be affected thereby had never seen or heard of it. Neither would it be thought, in case of a legislative enactment being enforceable as to one person, it would not be as to another, or that knowledge of either would have any bearing on the question. I do not see why the rule, which, contingent upon publication, was a law, stands upon any different basis than any other law, or how the evidence, given so much significance to exempt the captain of the Rutledge from conforming to the rule, had any relevancy.

Can it be that whether a rule, designed to have the force of law upon the navigable waters of the country, is effective or not, depends upon whether the local officers of the United States in close touch with river pilots and charged with administrative duties in respect to navigable waters, do their duty as regards delivering copies to the pilots, or the proprietors of boats do their duty as to posting up rules thereon? If so, a very confused situation exists. In the circumstances of this case, what might be actionable negligence as to one bridge tender might not as to another, and what might be actionable negligence as to one boat might not as to another. So each bridge tender would have to shape his course, at all times, as if no such rule existed, since it would be impossible for him to know whether a pilot was under the law or not.

Again, can it be that failure to post up regulation rules on a boat, as required by law, which would necessarily be the failure of the proprietor or his agent, or both, or the failure of the pilot to obtain a copy of the rules, which it was his duty to do, can affect their efficiency as to him? These and other considerations occur to my mind as reasons why the decision is wrong.

The act of Congress did not prescribe any method for publishing the rules. There is no general federal act on the question. The law in providing that the rules shall, when published, have the force of law, under the circumstances leaves it to the discretion of the head of the War Department to publish rules in any reasonable way he sees fit. He evidently adopted, in this case, the method of printing the rule and sending copies to the local administrative officers in touch with the boatmen affected, expecting that such officers would use due diligence to bring the rule to the attention of pilots, and that each pilot would be diligent to discover all rules designed to govern his conduct, and that he and his employer would see that such rules were properly posted. Some such method of publication probably has been followed ever since we had navigation rules in this country emanating from the War Department. No record is found anywhere of its having been held ineffective. It seems to me it is a reasonable, and, therefore, efficient method, and that neither negligence of the local officers nor the proprietor of a boat, nor the pilot in charge, has anything to do with whether the rule is or is not law.

In my opinion, the act of sending copies of the rules to the local officers with directions, express or implied, to bring the same to the attention of persons intended to be affected, was a sufficient publication in contemplation of the act of Congress. Moreover, in my opinion, after such a rule has been in existence for so long a time as eight years and has been in force, in contemplation of the War Department, for that period, as in this case, and is conformed to by the bridge

tenders on the river, it should be presumed to have been duly published, especially so far as necessary to protect a bridge tender and his employer from liability for negligence.    The burden of proof should not be cast upon the person who relies upon the rule to prove publication, but on the one who challenges its validity to prove the contrary, otherwise the rule is liable to be the law in one case and not in another, and in one jurisdiction and not in another.    Such a situation as to the navigation laws would be very disastrous to persons and property.